FRED G. NEWELL, Appellant-Defendant,
v.
STATE OF INDIANA, Appellee-Plaintiff.
No. 78A05-0801-CR-2
Court of Appeals of Indiana.
September 4, 2008
LISA K. ROSENBERGER, Vevay, Indiana, ATTORNEY FOR APPELLANT.
STEVE CARTER, Attorney General of Indiana, GARY DAMON SECREST, Deputy Attorney General, Indianapolis, Indiana, ATTORNEYS FOR APPELLEE.

MEMORANDUM DECISION
ROBB, Judge.

Case Summary and Issues
Fred Newell appeals the trial court's denial of his motion to suppress evidence. Newell raises four issues, which we restate as: 1) whether police officers had reasonable suspicion to detain Newell after a traffic stop; 2) whether the officers were authorized to conduct a warrantless pat-down search and seize evidence discovered during this search; 3) whether the Fifth Amendment to the Federal Constitution bars admission of statements made by Newell without being advised of his Miranda rights and evidence seized following these statements; and 4) whether the trial court abused its discretion in denying Newell's motion to suppress blood test results. Concluding that officers had reasonable suspicion to detain Newell; that the pat-down search was a permissible search incident to an arrest and that the officers lawfully seized evidence during this search; that the Miranda violations preclude the admission of Newell's statements, but that under the Federal Constitution, Miranda does not preclude the admission of the physical evidence obtained following these statements; and that the blood tests should not be suppressed as Newell consented to the tests, we reverse in part, affirm in part, and remand for further proceedings.

Facts and Procedural History
On May 16, 2007, at approximately 3:00 a.m., Deputy David Thomas, of the Switzerland County Sheriff's Department, stopped Newell for speeding. Deputy Thomas had clocked Newell going sixty-seven miles-per-hour in a fifty-five miles-per-hour zone. Deputy Thomas asked Newell for his license, and observed Newell pass by his license twice while looking for it in his wallet. Deputy Thomas also testified that he noticed that Newell's eyes were glassy and bloodshot and that his speech was slurred. Deputy Thomas did not detect the odor of alcohol or marijuana.
Deputy Brian Earls then arrived on the scene. Deputy Thomas told Deputy Earls that he suspected Newell was impaired, and asked Deputy Earls to request further documentation from Newell so that Deputy Earls could make his own assessment of Newell's condition. Deputy Earls asked Newell for proof of insurance, but Newell presented his medical insurance card. Deputy Earls also noticed that Newell's eyes were glassy and bloodshot and that he had slurred speech. Deputy Earls then asked Newell to exit the car to undergo field sobriety tests. Deputy Thomas then approached the passenger side of the vehicle and asked the front seat passenger whether Newell had been drinking. The passenger responded that "[s]he wasn't for sure, but he may have and if he did, it was a couple hours prior [t]o the stop." Transcript at 7.
Deputy Earls gave Newell the gaze nystagmus test, which Newell failed. Deputy Thomas testified that he observed Deputy Earls conduct the field sobriety tests, and that Newell failed the one leg stand, "by using his arms for support and not keeping [t]hem down to his side like instructed throughout the test and his balance [b]eing unsteady," id. at 8, and the walk and turn "by using his arms again for support throughout the test by missing [h]eel to toe on all steps both the first nine steps up and the second nine steps [b]ack by stepping off line on all steps and by starting to make a third pass [without being instructed to do so]," id. Deputy Thomas then gave Newell a portable breath test; the result of this test was .000.
Deputy Thomas opined that Newell's "impairment based on . . . observations . . . [was not] fitting with coming up with no [a]lcohol in his system," id., and read Newell the Indiana implied consent law. Newell agreed to submit to a chemical test. Deputy Thomas then put Newell in handcuffs and both deputies conducted a pat-down search. Deputy Thomas found nothing, but Deputy Earls found a pipe and a vial containing cocaine. Deputy Earls testified that when he felt Newell's pocket he "felt it and it was known to [him] to be a pipe to [s]moke some sort of drug through my training and experience," and when he first felt the vial, he "was aware it was a vial [but] didn't know what was in it." Id. at 34. Deputy Thomas opened the vial and observed a white substance. He asked Newell if the substance was "meth or cocaine," id. at 22, and Newell responded that it was cocaine. Deputy Thomas then put Newell in the back of his police vehicle and drove to the hospital. Deputy Thomas testified that the following exchange took place when they arrived at the hospital:
I pulled him out of the back seat of the car and I explained to him my concerns [w]ith him possibly having more cocaine on him. I told him that he needed to [c]ome clean with me and let me know if he had any more on him because [o]nce we got to the jail, if he introduced that into booking and I found it that I would charge him with trafficking at which time he admitted that he had [s]ome more cocaine on him and told me where it was at and I pulled two small [b]ags of a white powdery substance that I believed to be cocaine out of his [r]ight watch pocket.
Id. at 10-11.
Hospital employees drew blood from Newell. In order to obtain the results, Deputy Thomas filled out a "Certification Form," on which he marked a box indicating that he "certifie[d] in writing to be true," that Newell "refused consent," had been "transported to the hospital for treatment," and had been involved in an accident occurring not more than three hours before the draw and resulting in serious bodily injury to or death of another. Appellant's Appendix at 6. The result of the blood draw was not admitted at the suppression hearing.
On May 18, 2007, the State charged Newell with possession of a narcotic drug, a Class B felony; OWI, a Class A misdemeanor; OWI, a Class C misdemeanor; operating with a controlled substance in the body, a Class C misdemeanor; and possession of paraphernalia, a Class A misdemeanor.
On July 24, 2007, Newell filed a motion to suppress. On September 25, 2007, the trial court held a hearing on this motion. On October 26, 2007, the trial court issued an order denying this motion. Newell now brings this interlocutory appeal challenging the trial court's denial of his motion.

Discussion and Decision

I. Standard of Review
We conduct our review of the denial of a motion to suppress "in a manner similar to other sufficiency matters." Marlowe v. State, 786 N.E.2d 751, 753 (Ind. Ct. App. 2003). We will not reweigh evidence or judge witness credibility, and will consider conflicting evidence in a light favorable to the trial court's ruling. In re J.V., 875 N.E.2d 395, 399 (Ind. Ct. App. 2007), trans. denied. "Unlike typical sufficiency reviews, however, we will consider not only the evidence favorable to the judgment, but also the uncontested evidence favorable to the defendant." Carroll v. State, 822 N.E.2d 1083, 1085 (Ind. Ct. App. 2005).
Also, we consider de novo questions of whether reasonable suspicion existed to support police action. D.K. v. State, 736 N.E.2d 758, 761 (Ind. Ct. App. 2000). "Reasonable suspicion exists where the facts known to the officer and the reasonable inferences therefrom would cause an ordinarily prudent person to believe that criminal activity has or is about to occur." Bridgewater v. State, 793 N.E.2d 1097, 1099 (Ind. Ct. App. 2003), trans. denied. "Although reasonable suspicion requires more than inchoate and unparticularized hunches, it is a less demanding standard than probable cause and requires considerably less proof than that required to establish wrongdoing by a preponderance of the evidence." State v. Lefevers, 844 N.E.2d 508, 515 (Ind. Ct. App. 2006), trans. denied. We will make our determination by looking at the totality of the circumstances. Id.

II. The Stop
Newell does not contest the initial stop of his vehicle for speeding. See State v. Harris, 702 N.E.2d 722, 726 (Ind. Ct. App. 1998) ("[A] police officer may briefly detain someone whom the officer believes had committed an infraction"). However, he argues that the Deputies lacked the reasonable suspicion required to continue their investigation into his possible intoxication.
"[O]nce the purpose of the initial traffic stop has been completed, an officer cannot `further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" D.K., 736 N.E.2d at 761 (quoting United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995)). "If the . . . detention exceeds its proper investigative scope, the seized items must be excluded under the `fruits of the poisonous tree doctrine.'" United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999). The State points to the following circumstances as giving the Deputies reasonable suspicion to continue their investigation: 1) Newell passed over his license while looking through his wallet; 2) Newell's glassy and bloodshot eyes; 3) Newell's slurred speech; and 4) Newell gave Deputy Earls his health insurance card when asked for proof of insurance.[1]
Both bloodshot eyes and slurred speech "are indicative of alcohol use." Lefevers, 844 N.E.2d at 515 (concluding officers had reasonable suspicion to continue stop based on these factors and an anonymous tip regarding an impaired driver); see also Shirley v. State, 803 N.E.2d 251, 255-56 (Ind. Ct. App. 2004) (concluding officers had reasonable suspicion to believe the defendant was intoxicated based on the defendant's "strong odor of an alcoholic beverage on his breath, glassy eyes, slightly slurred speech, and a sway" (internal quotation omitted)); cf. United States v. Tyler, 512 F.3d 405, 411 (7th Cir. 2008) (recognizing that slurred speech and bloodshot eyes are "usual signs of intoxication commonly cited by law enforcement officers"). We also note that the passenger in Newell's vehicle told Deputy Thomas that Newell may have been drinking earlier in the evening. See United States v. Caine, 517 F.Supp.2d 586, 589 (D. Mass. 2007) ("Although bloodshot and glassy eyes could be the result of a number of innocent causes, it was equally reasonable to suspect that Defendant's condition was caused by alcohol consumption (particularly after the Defendant admitted to drinking earlier that night).").
Based on these circumstances, we conclude that the Deputies had the reasonable suspicion necessary to continue the traffic stop to investigate Newell's possible intoxication.

III. The Pat-Down Search

A. Justification for the Search
Officers are permitted to conduct a "reasonable search for weapons for the protection of the police officer, where the officer has reason to believe that he is dealing with an armed and dangerous individual." Malone v. State, 882 N.E.2d 784, 786 (Ind. Ct. App. 2008). Although the officer need not be sure the individual is armed, to justify the search, "a reasonably prudent man in the circumstances [must] be warranted in the belief that his safety or that of other was in danger." Id. at 787. "The purpose of a Terry search `is not to discover evidence of a crime, but to allow the officer to pursue the investigation without fear.'" Harris v. State, 878 N.E.2d 534, 538 (Ind. Ct. App. 2007) (quoting Jackson v. State, 669 N.E.2d 744, 747 (Ind. Ct. App. 1996)), trans. denied. The "sole justification for a Terry search `is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 29 (1968)). Newell argues that the Deputies lacked the reasonable suspicion necessary to conduct a pat-down search.
"[I]t is generally reasonable for a prudent officer to pat-down persons placed in his patrol car, even absent a belief of dangerousness particularized to the specific detainee." Wilson v. State, 745 N.E.2d 789, 792 (Ind. 2001); see also Burkett v. State, 691 N.E.2d 1241, 1244 (Ind. Ct. App. 1998) ("Because at this point [the officer] would be alone in his vehicle with [the defendant] as he transported him to the county jail, a reasonably prudent man in the same circumstances would be warranted to pat down [the defendant] for his own safety."), trans. denied. However, the officer's decision to place the detainee in his vehicle must be reasonable. See Wilson, 745 N.E.2d at 792-93.
As Newell had already failed three field sobriety tests when the officers conducted the pat-down search, the officers clearly had reasonable suspicion to believe Newell had committed the crime of driving while intoxicated. See Datzek v. State, 838 N.E.2d 1149, 1158 (Ind. Ct. App. 2005) (recognizing that officers had probable cause[2] to believe the defendant had driven while intoxicated after the defendant failed field sobriety tests), trans. denied. The officers read Newell Indiana's implied consent law, and Newell agreed to undergo a chemical test. Under these circumstances, we conclude the officers' decision to place Newell in the police car to transport him to the hospital was reasonable. See Wilson, 745 N.E.2d at 793 (indicating that the supreme court "can envision various particularized circumstances . . . that may make it reasonably necessary for police to require a stopped motorist to enter a police vehicle," and citing Burkett, with the parenthetical "placing an apparently intoxicated motorist in a police car for transport to county jail for a certified breath test"). Therefore, the pat-down search was likewise permissible.

B. Seizure of the Evidence
Having determined that the pat-down search was permissible, we must next address Newell's argument that the officers were not justified in seizing the contraband discovered during the pat-down search. Both Newell and the State analyze the validity of this seizure under the "plain feel" doctrine, under which, if an officer "feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons," and the officer may seize the contraband. Johnson v. State, 710 N.E.2d 925, 928 (Ind. Ct. App. 1999) (quoting Minnesota v. Dickerson, 508 U.S. 366, 375-76 (1993)).
However, we need not address whether the "plain feel" exception applies here,[3] as we conclude that the evidence seized pursuant to the pat-down search is admissible pursuant to the exception to the warrant requirement that evidence is admissible when it is seized during a search incident to a lawful arrest.[4] See White v. State, 772 N.E.2d 408, 411 (Ind. Ct. App. 2002) ("A search incident to a lawful arrest is one such exception [to the warrant requirement]."). Under this exception, upon arresting a suspect, "police may search the arrestee and the area within the arrestee's immediate control." Id. Indiana statute defines "arrest" as the "taking of a person into custody, that he may be held to answer for a crime." Ind. Code § 35-33-1-5. An officer "arrests" a suspect when the officer "interrupts the freedom of the accused an[d] restricts his liberty of movement." Sears v. State, 668 N.E.2d 662, 667 (Ind. 1996). An officer may "arrest" a suspect even if he does not inform the suspect that he is under arrest, and this failure to inform "does not invalidate the search incident to arrest exception as long as there is probable cause to make an arrest." Fentress, 863 N.E.2d at 423. Probable cause to support a warrantless arrest exists when "at the time of the arrest, the officer has knowledge of facts and circumstances that would warrant a person of reasonable caution to believe that the suspect committed a criminal act." Moffitt v. State, 817 N.E.2d 239, 246 (Ind. Ct. App. 2004), trans. denied.
At the time officers conducted the pat-down search, Newell was handcuffed and was being readied to be placed in a police car for transport to the hospital for a blood draw. Deputy Thomas had informed Newell that he was "being detained and placed in handcuffs for a [c]hemical test." Tr. at 21. Clearly, Newell's freedom of movement was restricted to a sufficient degree to render him "under arrest." See Wright v. State, 766 N.E.2d 1223, 1230 (Ind. Ct. App. 2002) ("[W]e have previously held that the use of handcuffs would cause the reasonable person to feel that one was not free to leave, and that one's freedom of movement was restrained to the degree associated with a formal arrest." (citing Loving v. State, 647 N.E.2d 1123, 1125-26 (Ind. 1995))).
At the time officers conducted the pat-down search, Newell had already failed three field sobriety tests. Under these circumstances, officers had probable cause to arrest Newell for driving while intoxicated. See Datzek, 838 N.E.2d at 1158; Ackerman v. State, 774 N.E.2d 970, 982 n. 15 (Ind. Ct. App. 2002) (recognizing that "a police officer typically administers [field sobriety tests] to develop probable cause" (emphasis in original)), trans. denied; Huey v. State, 503 N.E.2d 623, 625-26 (Ind. Ct. App. 1987) ("[W]hen [the defendant] failed the field sobriety tests, [the officer] had probable cause to arrest [the defendant.]"); cf. VanPelt v. State, 760 N.E.2d 218, 223 (Ind. Ct. App. 2001) (holding officers had probable cause to arrest the defendant where officers smelled marijuana while talking to him and he failed two field sobriety tests), trans. denied; Rybolt v. State, 770 N.E.2d 935, 941 (Ind. Ct. App. 2002) (recognizing that an officer could have administered field sobriety tests, and "had [the defendant] failed those tests, [the officer] would have had probable cause to arrest and search [the defendant]"), trans. denied.
As Newell was under arrest at the time of the pat-down search, the evidence discovered during this search is admissible pursuant to the search incident to arrest exception to the warrant requirement.

IV. Evidence Obtained in Response to Officers' Questioning
Newell next argues that Deputy Thomas's questioning in the police vehicle without Miranda warnings violated his Fifth Amendment rights and that the trial court improperly declined to suppress Newell's statements made in response to these questions and the cocaine found by Deputy Thomas based on information gained through this questioning. He also argues that his response to Deputy Thomas's question as to the contents of the vial found during the pat-down search should be suppressed as Newell had not received Miranda warnings.
The State concedes that the questioning following the officers' discovery of the cocaine during the pat-down search and in the police car occurred while Newell was in custody and that the questioning constituted interrogation. Therefore, Newell's statements made in response to the officers' questions should have been suppressed, and we reverse the trial court's order in this regard. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).
The actual evidence obtained, however, is not inadmissible. "Miranda only requires suppression of statements, not physical evidence." Hirshey v. State, 852 N.E.2d 1008, 1015 (Ind. Ct. App. 2006) (citing United States v. Patane, 542 U.S. 630, 636 (2004)), trans. denied.[5] We therefore affirm the trial court's denial of Newell's motion to suppress the cocaine obtained during the pat-down search and the cocaine obtained after Newell told Deputy Thomas that he had more cocaine in his front pocket.[6]

V. The Blood Test Results
Newell next argues that the trial court improperly denied his motion to suppress the blood test results, as Deputy Thomas, when ordering the blood test at the hospital, filled out a form indicating that Newell had been involved in a motor vehicle accident resulting in serious bodily injury to or death of another person, and that Newell had not consented to the blood test.
We recognize that Deputy Thomas clearly submitted an affidavit in which he certified, under penalties for perjury, representations that were not true.[7] However, Newell has not explained how Deputy Thomas's submission of this affidavit renders the results of the blood test inadmissible. Cf. Abney v. State, 821 N.E.2d 375, 379 (Ind. 2005) (recognizing that Indiana Code section 9-30-6-6(g)[8] "is designed as a tool to acquire evidence of blood alcohol content rather than as a device to exclude evidence"). Newell does not dispute that he consented to the blood draw or argue that this consent was not voluntary. See Zimmerman v. State, 469 N.E.2d 11, 15-16 (Ind. Ct. App. 1984) (affirming the trial court's admission of a blood test where the defendant voluntarily consented to the taking of the sample); cf. Cochran v. State, 771 N.E.2d 104, 108 (Ind. Ct. App. 2002) (recognizing that a warrant or exigent circumstances are not required for a blood test to be admissible where the defendant consented to the test), trans. denied. Under these circumstances, we conclude the trial court did not improperly deny Newell's motion to suppress the results of the blood test.[9]

Conclusion
We conclude the trial court abused its discretion in denying Newell's motion to suppress the statements made in response to the officers' questions after they had arrested Newell. We also conclude that the trial court did not abuse its discretion in denying Newell's motion to suppress the physical evidence. We remand for proceedings consistent with this opinion.
Affirmed in part, reversed in part, and remanded.
BAKER, C.J., and RILEY, concur.
NOTES
[1] The State also points to evidence that Newell "may have stumbled" after exiting his vehicle. See Appellee's Br. at 9. However, as Newell had already been asked to exit the vehicle when he possibly stumbled, this factor does not contribute to our analysis of whether reasonable suspicion existed when the Deputies asked Newell to exit the car to continue their investigation. See Lefevers, 844 N.E.2d at 515 n. 4.
[2] As discussed in more detail below this probable cause allowed the officers to place Newell under arrest. The pat-down search is also justifiable on the grounds that it was conducted as a search incident to an arrest.
[3] We note that Deputy Thomas actually opened the vial, which "at the time [Deputy Thomas] didn't know what it was." Tr. at 21 (testimony of Deputy Thomas). We fail to see how the plain feel exception could possibly be extended to allow such a search. See Dickerson, 508 U.S. at 379; Fentress v. State, 863 N.E.2d 420, 423 (Ind. Ct. App. 2007); Barfield v. State, 776 N.E.2d 404, 407 (Ind. Ct. App. 2002).
[4] Although the State does not argue that the evidence is admissible pursuant to this exception, "[w]e will affirm the denial [of a motion to suppress] if it is sustainable on any legal grounds apparent in the record." Jones v. State, 866 N.E.2d 339, 342 (Ind. Ct. App. 2007), trans. denied; cf. Alford v. State, 699 N.E.2d 247, 250 (Ind. 1998) ("Although the trial court's reason for admitting the confession was erroneous, we will affirm the judgment of the trial court if it is sustainable on any legal grounds apparent in the record.").
[5] The State does not cite this rule, but instead argues that the cocaine is admissible under the inevitable discovery rule. However, we may affirm the trial court's decision based on the rule stated in Patane. See, supra, note 4.
[6] We do not condone Deputy Thomas's questioning of Newell after arresting him without first giving Miranda warnings. However, the Supreme Court clearly held that Miranda violations are not the basis for suppression of physical evidence obtained as a result of information gained through questioning that violates Miranda. Patane, 542 U.S. at 637 (plurality opinion) ("[T]he exclusionary rule articulated in cases such as Wong Sun does not apply [to Miranda violations]."). As Newell does not invoke the Indiana Constitution, we make no statement as to whether the Indiana Constitution extends protection not afforded in the Federal Constitution. See Commonwealth v. Martin, 827 N.E.2d 198, 203 (Mass. 2005) ("To apply the Patane analysis to the broader rights embodied in [the Massachusetts Constitution] would have a corrosive effect on them, undermine the respect we have accorded them, and demean their importance to a system of justice chosen by the citizens of Massachusetts in 1780."); State v. Farris, 849 N.E.2d 985, 996 (Ohio 2006) (declining to adopt Patane's rationale and stating, "We believe that the overall administration of justice in Ohio requires a law-enforcement environment in which evidence is gathered in conjunction with Miranda, not in defiance of it."), cert. denied; State v. Vondehn, 184 P.3d 567, 576 n. 15 (Ore. Ct. App. 2008); State v. Peterson, 923 A.2d 585, 592 (Vt. 2007) (declining to follow the approach of Patane under the state constitution, and noting that Patane's approach "create[s] an incentive to violate Miranda"); State v. Knapp, 700 N.W.2d 899, 920 (Wis. 2005) (agreeing "wholeheartedly" with the Patane dissenting opinion, stating that Patane extends "an unjustifiable invitation to law enforcement officers to flout Miranda where there may be physical evidence to be gained" (quoting Patane, 542 U.S. at 647 (Souter, J., dissenting))).
[7] The record indicates that Deputy Thomas acted negligently, but in not way indicates that Deputy Thomas intended to deceive hospital staff members or sought some sort of advantage by making these certifications. It appears that Deputy Thomas simply checked the wrong box on the form affidavit.
[8] This subsection is the basis for the part of the certification form to which Deputy Thomas attested. The subsection states:

A physician or a person trained in obtaining bodily substance samples and acting under the direction of or under a protocol prepared by a physician shall obtain a blood, urine, or other bodily substance sample if the following exist:
(1) A law enforcement officer requests that the sample be obtained.
(2) The law enforcement officer has certified in writing the following:
(A) That the officer has probable cause to believe the person from whom the sample is to be obtained has violated IC 9-30-5.
(B) That the person from whom the sample is to be obtained has been involved in a motor vehicle accident that resulted in the serious bodily injury or death of another.
(C) That the accident that caused the serious bodily injury or death of another occurred not more than three (3) hours before the time the sample is requested.
(3) Not more than the use of reasonable force is necessary to obtain the sample.
[9] We make no statement as to the ultimate admissibility of the blood test at trial.